IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

UNITED STATES OF AMERICA

v.                                                          CRIMINAL NO. 2:24-cr-19-KS-MTP

JASON L. CRACE

## STATEMENT OF FACTS

By signing below, the parties stipulate to and agree not to contest the following facts and stipulate that such facts, in accordance with Rule 11(b)(3) of the Federal Rules of Criminal Procedure, provide a sufficient factual basis for the plea of guilty to aiding and assisting in the preparation of false tax returns, in violation of Title 26, United States Code, Section 7206(2). The parties further stipulate that, were this case to proceed to trial, the United States has sufficient admissible evidence to prove each and every one of these facts beyond a reasonable doubt.

1.  Between the 2013 and 2022 tax years, Defendant **JASON L. CRACE** ("**CRACE**") helped implement an illegal tax shelter (the "Royalty Shelter)" by preparing federal income tax returns that claimed millions of dollars in false deductions for fake business expenses. To conceal the illegal nature of those tax deductions, **CRACE** and others took steps to mislead the IRS into believing that Royalty Shelter participants were properly deducting the "payment" of "royalties" as ordinary and necessary business expenses. As **CRACE** and the Royalty Shelter promoters knew, the "royalty payments" were not really ordinary and necessary business expenses. To the contrary, the "payments" were just a circular flow of money: clients sent money to a bank account controlled by the Royalty Shelter promoters, and then the promoters sent the money (less fees) right back to a different bank account that the clients controlled.

### A. The Defendant, Other Individuals, and Entities

2. Since at least 2013 and continuing through at least May 2024, **CRACE** was a Certified Public Accountant ("CPA") residing in or around Fishers, Indiana. **CRACE** knew that he was not an expert (and lacked experience with) international taxation and the valuation of intellectual property. His accounting experience was primarily in the area of basic tax return preparation for individuals and small businesses.

3. Promoter 1 was a financial advisor and insurance salesman. Promoter 1 was a resident of Niles, Michigan between approximately 2012 and September 2015, and of the state of Florida from approximately September 2015 through present. **CRACE** knew that Promoter 1 was neither a CPA nor an attorney.

4. Promoter 2 was a former financial advisor and insurance salesman and a close relative of Promoter 1. Promoter 2 resided in or around New Carlisle, Indiana from at least 2012 through 2014, and resided in Kyle, Texas from approximately 2014 through his death in March 2024. **CRACE** knew that Promoter 2 was neither a CPA nor an attorney.

5. Promoter 3 was an attorney licensed to practice law in the State of California. By January of 2017, at the latest, **CRACE** knew that Promoter 3 lacked experience and expertise in the law of taxation and international tax.

6. Advisor 1 was a financial advisor and insurance salesman. Advisor 1 resided near Grand Rapids, Michigan until approximately 2013 and then in Las Vegas, Nevada from approximately 2014 through present.

7. Intellectual Property Management Services, LLC ("IPMS") was a business entity registered in the State of Indiana on or about November 4, 2013.

8. Intellectual Property Management Services, International, Ltd. ("IPMSI") was a business entity registered in the island of Nevis on or about November 28, 2013.

9. The Desert Spring 2016 Irrevocable Trust ("Desert Spring Trust") was a domestic business trust formed in Nevada by a family member of Advisor 1 on or about February 25, 2016. **CRACE** was the trustee of the Desert Spring Trust. Advisor 1 and Advisor 1's spouse were the primary beneficiaries.

10. IPMS Nevada, LLC (IPMS-NEVADA) was a domestic limited liability company registered in the state of Nevada on or about March 2, 2016. At the time of registration, **CRACE** (as the trustee of the Desert Spring 2016 Irrevocable Trust) was the managing member of IPMS-NEVADA.

11. Strategic IP Management Services Ireland Limited ("Irish 1" or "SIPMSI, LTD") was a business entity registered in Ireland on or about February 10, 2014.

### B. Relevant Terms and Concepts

12. Treasury Department Circular No. 230 (Subtitle A, Part 10, 31 C.F.R.) set standards for those practicing before the Internal Revenue Service ("IRS"). Although practitioners, like **CRACE**, are permitted to rely on information provided by their clients when preparing tax returns, the standards expressly prohibit practitioners from ignoring the implications of information furnished to, or actually known by, the practitioner, and further requires practitioners to make reasonable inquiries if the information as furnished appears to be incorrect, inconsistent with an important fact or another factual assumption, or incomplete.

13. The Internal Revenue Code allowed taxpayers to reduce their taxable income (and often the resulting taxes due to be paid) by deducting the "ordinary and necessary" business expenses that the taxpayer paid or incurred for carrying on a trade or business. An "ordinary" expense was one that was common and accepted in the taxpayer's industry. A "necessary" expense was one that was helpful and appropriate given the taxpayer's trade or business (apart from any tax benefits).

14. If a taxpayer operated a sole proprietorship, the taxpayer could deduct ordinary and necessary business expenses on Schedule C, Profit or Loss From Business ("Schedule C") attached to the taxpayer's Form 1040, U.S. Individual Income Tax Return ("Form 1040"). If a taxpayer operated a partnership or an S corporation, the taxpayer could deduct ordinary and necessary business expenses on a Form 1065, U.S. Return of Partnership Income ("Form 1065") or on a Form 1120S, U.S. Income Tax Return for an S Corporation ("Form 1120S"), respectively. After accounting for ordinary and necessary business expenses, a taxpayer's share of income or loss from a partnership or S corporation was then reported to the taxpayer on a Schedule K-1 and, ultimately, claimed on the taxpayer's Form 1040.

15. A Form 1120-F, U.S. Income Tax Return of a Foreign Corporation ("Form 1120-F") was a return filed by a foreign corporation to report its income, gains, losses, deductions, credits, and to report its U.S. income tax liability.

### C. Origin, Purpose, and Operation of the Royalty Shelter

16. From in or about October 2013 through at least December 2023, Promoter 1 created, promoted, and sold the Royalty Shelter, which was simply a circular flow of money designed to create the false appearance that participants were incurring deductible ordinary and necessary business expenses. Beginning in March 2016 and continuing until at least December 2023, **CRACE** and Advisor 1 assumed day-to-day management of the Royalty Shelter through IPMS-NEVADA. During this period, Promoter 1 continued to provide some support to operating the Royalty Shelter; Promoter 1 and Promoter 2 also continued to request and receive a share of Royalty Shelter profits.

17. Promoter 1 (and later Advisor 1) directed clients to transfer money to bank accounts in the name of IPMS or—after March 2016—IPMS-Nevada. Almost immediately after the transfer to IPMS or IPMS-NEVADA, Promoter 1 (and later **CRACE**) would cause those funds

to be sent (less fees retained by IPMS or IPMS-NEVADA) to a bank account that was under the control of the client. These transfers were intended to create the false appearance that the client had "paid" IPMS or IPMS-NEVADA a tax-deductible "royalty" for the purported use of "intellectual property," even though the client retained control of the transferred funds.

18. At Promoter 1's recommendation, one or more participants in the Royalty Shelter retained **CRACE** to serve as their federal tax return preparer for the 2014 through 2022 tax years.

19. The decision about whether (and how much) to "pay" in "royalties" was purely tax driven and based upon the amount of income clients wanted to shelter from the IRS on their tax returns. For example, on or about December 29, 2015, Promoter 1 emailed **CRACE** regarding the amount of purported "royalty" Client E would need to send to IPMS to reduce his income taxes to a desired amount:

> What [Client E] is trying to accomplish is paying $200,000 in taxes total for the feds and state, but no more than this. . . So with a $300,000 retirement plan contribution how much of a royalty payment does he need to make to drop his total state and fed tax liability to $200,000 including [self-employment] taxes?

**CRACE** responded that he could "put together a ballpark royalty and retirement funding level necessary to drive the liabilities down to about $200,000." **CRACE** performed no analysis to determine whether (or how) the purported "royalty payment" from Client E was related to the revenue supposedly generated from Client E (or his company's) purported intellectual property.

20. Promoter 1 and Promoter 2 required most Royalty Shelter clients to pay a fee equal to a percentage of the amount of money that they would ultimately deduct as fraudulent business expenses for "royalties." In order to create an incentive for higher overall fees, the fee schedule reduced the "percentage" charged as the size of the "royalties" purportedly paid

increased. After **CRACE** and Advisor 1 assumed management responsibility for the Royalty Shelter in or about March 2016, they charged most clients similar fees. Promoter 1 and Promoter 2 continued to request and receive a portion of these fees, even though they no longer managed the Royalty Shelter on a day-to-day basis. At Promoter 1's direction, some or all of these fees were placed into an account in the name of Promoter 2's trust.

### D. False Claims to Promote the Royalty Shelter

21. On or about November 7, 2013, **CRACE** emailed Promoter 1 and requested a phone call to "go over [**CRACE**'s] role in the short term, long term, and if [**CRACE**] should reach out to [Clients A1 and A2]." On or about November 8, 2013, **CRACE** emailed Clients A1 and A2:

> Working with [Promoter 1], I ensure that all of our financial and tax plans are in compliance with the current income tax code. I also assist [Promoter 1] in documenting our tax positions and perform all necessary tax research with regard to investment types, entity structures and deductibility of your business expenses.

This was a misrepresentation. In fact, **CRACE** did not investigate whether the business expenses that Royalty Shelter clients claimed for purported "royalties" complied with the Internal Revenue Code. Apart from asking Promoter 1 what intellectual property Clients A1 and A2 purportedly owned, **CRACE** did not assist Promoter 1 in documenting or researching the deductibility of the royalty expenses by such means as: assessing whether clients had intellectual property to license, determining what particular intellectual property clients were purportedly licensing to the Royalty Shelter, valuing the clients' purported intellectual property, determining the amount of clients' revenue generated by their purported intellectual property, or calculating a reasonable amount of royalties clients should pay to license the purported intellectual property.

6

22. Moreover, **CRACE** knew that Promoter 1 convinced clients to participate in the Royalty Shelter by purposely misrepresenting it as the same as (or very similar to) an international tax strategy that a prominent U.S. multinational corporation had reportedly used to reduce its worldwide tax burden.

23. On or about February 26, 2014, **CRACE** received an email from Promoter 1 in which Promoter 1 conceded that the Royalty Shelter was materially different from the international tax strategy to which he had falsely compared it. Among the material differences that Promoter 1 identified was that there was no second Irish company with operations in Ireland.

24. Thereafter, on or about May 20, 2014, Promoter 1 caused the formation of Irish 2, Strategic IP Sales and Marketing Limited (SIPSM). SIPSM was not incorporated until well after Royalty Shelter clients had already transferred "royalties" in 2013 and claimed deductions for ordinary and necessary business expenses that were purportedly "paid" to several entities, including SIPSM (Irish 2).

**E. IRS Investigation of Royalty Shelter and Actions to Impede the Investigation**

25. On or about January 23, 2016—shortly after the IRS had seized assets belonging to several Royalty Shelter clients in connection with a healthcare fraud investigation— Promoter 1 emailed **CRACE**: "Apparently the IRS is involved in the investigation and has been asking a lot of questions about IPMS and that structure[.]"

26. On or about January 27, 2016, Promoter 3 emailed Promoter 1 and Promoter 2 to ask if they would consider requesting that any discussions with the IRS be treated as a Voluntary Disclosure. Voluntary Disclosure was a longstanding practice of IRS – Criminal Investigation that was intended to encourage individuals to disclose their willful violations of the federal tax laws and potentially resolve their conduct through a civil process (rather than criminal prosecution). Promoter 1 replied (copying **CRACE**) and opined that it was probably too late to

7

apply to the program because, among other things, the IRS was already investigating IPMS. **CRACE** responded that he needed to retain his own attorney because he "was a paid preparer on the business returns for [Client B and Client F] that took the significant deductions per the royalty agreements, as well as, the Series LLC returns and the 1120F. And that is where most of my exposure lies." Promoter 3 replied to **CRACE**, in part, "[M]y hope is to bifurcate the IRS aspects to an audit type review … and to try to move away from the joint investigation criminal process[.]"

27. On or about January 31, 2016, Promoter 1 emailed **CRACE** to instruct him to prepare a 2013 Form 1120-F for Irish 2 (SIPSM) and to amend Irish 2's 2014 Form 1120-F, which **CRACE** had filed just a few months prior, on or about October 17, 2015. On Irish 2's 2014 Form 1120-F, **CRACE** had accurately listed Irish 2's date of incorporation as May 20, 2014, and correctly marked the return as an "initial return" for the calendar year ending December 31, 2014.

28. Following Promoter 1's instructions, **CRACE** prepared an amended Form 1120-F that falsely reported that Irish 2 (SIPSM) was incorporated in 2013, when in fact, he knew it was incorporated in May 2014. The false incorporation date was intended to conceal from the IRS that there were not two Irish companies in operation at the time Promoter 1's clients purportedly "paid royalties," which the clients later deducted as ordinary and necessary business expenses on their 2013 tax returns.

### F. CRACE Assumes Management of the Royalty Shelter Knowing It to Be Fraud

29. Following the IRS's January 2016 execution of search and seizure warrants on several IPMS participants, Promoter 1 and Advisor 1 discussed a possible sale and restructuring

of the Royalty Shelter from Promoter 1 and Promoter 2 to Advisor 1. On or about February 22, 2016, **CRACE** sent an email to Promoter 1 and Advisor 1 that stated:

> I think I have developed a strategy for my role in these entities and am glad to run it by you guys this AM. Because of my license, I have to keep my ownership out of my name. Very similar to issues with [Advisor 1].
> [. . .]
> We are all friends and I still think there is a lot more money to be made down the road. SO, these are just some initial thoughts.

30.     On or about March 3, 2016, **CRACE** (as the trustee of the Desert Springs Trust) and Promoter 2 (as trustee of a separate trust) signed a sale agreement for the Royalty Shelter.

31.     On or about March 31, 2016, **CRACE** opened a bank account (ending in 8202) at Bank 1 in the name of IPMS Nevada.

32.     By no later than August 31, 2016, **CRACE** understood that the "royalties" transferred to IPMS were not legally deductible as ordinary and necessary business expenses. In particular, **CRACE** understood that the "royalty" transfers were voluntary and served no purpose and provided no benefit beyond the tax savings. He further understood that the purported "payments" were simply the cycling of clients' funds through different bank accounts. Despite this, **CRACE** made an affirmative decision to continue with his fraudulent activity.

### G. Promoter 1 Continued to Receive Fees from Royalty Shelter Clients

33.     On or about January 15, 2017, **CRACE** emailed Promoter 1 regarding the fees earned from Royalty Shelter clients:

9

> Per [Advisor 1], he is splitting the 5% IPMS fee on [Client E]'s $2.5 M in royalties. I have it allocated and ready to go. How do you want that disbursed?
>
> Wired to trust account like the loan payments?
> Check to you or one of your other entities?
>
> Just let me know.

34. On or about January 14, 2022, Promoter 1 emailed **CRACE** regarding Promoter 1's fees from Royalty Shelter clients and specifically asked: "when the payment from the Desert Springs Trust will be sent and the amount?"

35. On or about February 17, 2023, Promoter 2—copying Promoter 1—emailed **CRACE** and Advisor 1: "I noticed for the past several years a payment has been made on the sale note in the month of January. We are now in mid-February and would like to know your plan for taking care of due payment on the 2022 production and when I can expect to receive it."

36. On or about December 1, 2023, Promoter 2 emailed **CRACE**, "As busy and crazy as it is you may have overlooked the essential payment. Please update me as to status please."

### H. CRACE Prepared False Tax Returns for Royalty Shelter Clients

37. No later than August 2016, **CRACE** knew that IPMS was winding up and had no intellectual property to license. **CRACE** also knew that IPMSI and the two Irish companies had ceased operating as of December 31, 2015. Nevertheless, **CRACE** prepared a 2016 Form 1040 for Promoter 1 and a 2016 Form 1120S for a business owned by Promoter 1, both of which fraudulently claimed deductions for business expenses for "royalties" purportedly paid to IPMS, as set forth in paragraph 41 below.

38. On or about December 28, 2016, **CRACE** emailed Client S about the transition from IPMS to the IPMS-Nevada. He wrote:

> In order to properly complete the asset transfer documents for the transfer of the IP and other assets to the new LLC, I need a detailed list of what the current IPMSI owns. The listing I have . . . is a checking account and a promissory note. Is there anything else?

On or about December 29, 2016, Client S responded to **CRACE**, "There are no other assets other than the two you mentioned." Despite this, **CRACE** prepared 2016 and 2017 Forms 1040 for Client S that fraudulently claimed deductions on Schedule C for business expenses for "royalties" arising from the purported use of intellectual property in connection with Client S's business, as set forth in paragraph 41 below.

39. On or about September 13, 2017, in the Southern District of Mississippi and elsewhere, **CRACE** willfully aided and assisted in, and procured, counseled, and advised the preparation and presentation to the IRS of a Form 1120S [handwritten: 1065 ook] for Company E, an S corporation owned by Client E, for calendar year 2016, which was false and fraudulent as to a material matter. That return reported "Other deductions" on Line 20 of $2,768,113, which included a $2,425,000 business expense for "royalties," whereas, as **CRACE** knew, Company E did not incur a $2,425,000 ordinary and necessary business expense for "royalties."

40. While helping to manage the Royalty Shelter, **CRACE** also assisted in the preparation of the following materially false tax returns, which he knew likewise claimed deductions for fraudulent business expenses for purported "royalties:"

11

| FALSE IRS FORM | ROYALTY SHELTER CLIENT | YEAR | DATE (APPROX) | AMOUNT OF FALSE ROYALTY DEDUCTION (APPROX) |
|---|---|---|---|---|
| Amended 1040 | CLIENT S | 2014 | 12/03/2016 | $100,000 |
| 1040 | CLIENT S | 2015 | 11/21/2016 | $120,000 |
| 1040 | CLIENT S | 2016 | 11/06/2017 | $100,000 |
| 1040 | CLIENT S | 2017 | 11/12/2018 | $100,000 |
| 1065 | COMPANY F | 2015 | 10/10/2016 | $2,088,676 |
| 1065 | COMPANY F | 2016 | 09/25/2017 | $401,447 |
| 1120S | COMPANY A1 | 2016 | 03/27/2017 | $325,000 |
| 1120S | COMPANY A1 | 2017 | 06/25/2018 | $200,000 |
| 1120S | COMPANY A1 | 2018 | 02/25/2019 | $190,000 |
| 1120S | COMPANY A1 | 2019 | 03/23/2020 | $150,000 |
| 1120S | COMPANY A1 | 2020 | 03/08/2021 | $100,000 |
| 1120S | COMPANY K | 2017 | 04/14/2018 | $25,000 |
| 1120S | COMPANY K | 2018 | 02/23/2019 | $3,250,000 |
| 1120S | COMPANY K | 2019 | 04/02/2020 | $1,000,000 |
| 1120S | COMPANY K | 2020 | 03/28/2021 | $1,250,000 |
| 1120S | COMPANY FF | 2015 | 10/03/2016 | $850,100 |
| 1040 | PROMOTER 1 | 2016 | 10/05/2017 | $130,000 |
| 1120S | PROMOTER ENTITY 1 | 2016 | 07/10/2017 | $161,600 |

41.     **CRACE** prepared the above returns in paragraph 40 knowing that the royalty deductions were not ordinary and necessary businesses expenses because, among other things, (1) the amount of the so-called "royalty payment" was not related to the income or revenue (if any) generated from the use of licensed intellectual property (if any); and (2) the so-called "royalty payments" were quickly returned (less the shelter promoters' fees) to a bank account under the clients' control.

42.     The tax loss arising from the false royalty deductions claimed on the tax returns described in paragraph 40, above, was approximately $2,532,936.

43.     **CRACE** also assisted in the preparation of the following materially false tax returns, which claimed deductions for fraudulent business expenses for purported "royalties:"

12

| FALSE IRS FORM | ROYALTY SHELTER CLIENT | YEAR | DATE (APPROX) | AMOUNT OF FALSE ROYALTY DEDUCTION (APPROX) |
|---|---|---|---|---|
| 1120S | COMPANY A1 | 2013 | 05/05/2014 | $500,000 |
| 1120S | COMPANY A1 | 2014 | 04/13/2015 | $550,000 |
| 1120S | COMPANY A1 | 2015 | 03/21/2016 | $305,000 |
| 1120S | COMPANY FF | 2014 | 10/05/2015 | $750,000 |
| 1120S | COMPANY EE | 2014 | 02/05/2015 | $400,000 |

44. This Statement of Facts includes those facts necessary to support a plea agreement between the defendant and the United Sates. It does not include every fact known to the defendant or the United Sates and it is not intended to be a full enumeration of all the facts surrounding the defendant's case.

Respectfully submitted,

TODD W. GEE
UNITED STATES ATTORNEY

By: *Charles W. Kirkham*
Charles Kirkham
Assistant United States Attorney
Southern District of Mississippi

*Richard J. Hagerman*
William Montague
Richard J. Hagerman
Matthew Hicks
Trial Attorneys
U.S. Department of Justice, Tax Division

13


Defendant's Stipulation and Signature

After consulting with my attorney and pursuant to the Plea Agreement I entered into this day with the United States, I hereby agree and stipulate that the above Statement of Facts is true and accurate. I further agree and stipulate that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

7/9/2024
Date

JASON L. CRACE
Defendant

Defense Counsel's Signature

I am counsel for the defendant. I have carefully reviewed the above Statement of Facts with him and, to my knowledge; his decision to agree to this Statement of Facts is an informed and voluntary one.

7/9/2024
Date

Jonathan Bont
Winfield Ong
John Collette
Counsel for Mr. Crace